# IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

| | | |
|---|---|---|
| KUN JIANG, | ) | |
|       Plaintiff, | ) | |
|     v. | ) | C.A. No. 2023-0780-LM |
| | ) | |
| HASLET PARK HOMEOWNERS | ) | |
| ASSOCIATION and MASTRIANA | ) | |
| PROPERTY MANAGEMENT, INC., | ) | |
| | ) | |
|       Defendants. | ) | |
| | ) | |
| HASLET PARK HOMEOWNERS | ) | |
| ASSOCIATION, INC., | ) | |
| | ) | |
|       Counterclaim Plaintiff, | ) | |
|     v. | ) | |
| | ) | |
| KUN JIANG, | ) | |
|       Counterclaim Defendant. | ) | |

Final Report: February 6, 2026
Date Submitted: October 13, 2025

## POST-TRIAL FINAL REPORT

Kun Jiang, Newark, DE; *Pro Se Plaintiff/Counterclaim Defendant.*

Kenneth M. Doss, CASSARINO, CHRISTMAN SHALK RANSOM & DOSS P.A., Wilmington, DE; *Attorney for Defendant Haslet Park Homeowners Association*

Melissa L. Rhoads, TIGHE & COTRELL, P.A., Wilmington, DE; *Attorney for Defendant Mastriana Property Management Company*

Robert J. Valihura, Jr., Caren Sydnor, MORTON, VALIHURA & ZERBATO, LLC, Greenville, DE; *Attorneys for Counterclaim Plaintiff Haslet Park Homeowners Association, Inc*

**MITCHELL, M.**

This matter arises from a dispute between homeowner Kun Jiang, the Haslet Park Condominium Association, and Mastriana Property Management concerning Mr. Jiang's window replacement and his subsequent challenges to the 2023 Board election. Mr. Jiang argues that the Board and the management company breached their fiduciary duty by not approving his windows and acted beyond their authority by imposing monetary fines and by adopting a Resolution to recoup legal fees shortly after he filed suit and expressed interest in serving on the Board. The Association contends that Mr. Jiang violated the Governing Documents by replacing his windows without prior approval. For the reasons explained below, judgment should be entered in favor of Mastriana, partially in favor of Mr. Jiang, and partially in favor of the Haslet Park Condominium Association.

This is my Final Report.

## I. FACTUAL BACKGROUND[1]

This matter arises from the events within the Haslet Park community, a condominium development in Newark, Delaware.[2] Kun Jiang ("Jiang" or "Plaintiff") owns the unit located at 17 Cornwallis Square, which he purchased on

---

[1] The facts in this report reflect my findings based on the record developed at the two-day trial held on September 9, 2025, and September 10, 2025. I grant the evidence the weight and credibility I find it deserves. Citations to the transcript will be in the form of "Tr. __." Citations to the Docket are cited in the form of "D.I. __". Deposition transcripts are cited as "[Last Name] Dep. Tr. __." The parties submitted joint exhibits numbered 1–76. Citations to the joint exhibits are in the form of "JX __."

[2] D.I. 1 at 2.

July 9, 2018.[3]  The community is governed by a Council ("Council") and managed by Mastriana Property Management, Inc. ("Mastriana") pursuant to a Property Management Agreement ("Management Agreement").[4]

In late September 2022, Mr. Jiang replaced the windows on the second-story of the front side of his unit.[5]  The new windows differed from his previous windows in that they opened vertically rather than horizontally.[6]  The new windows also contained decorative muntins.[7]  Shortly after the windows were installed, two members of the Council noticed the new windows while out on a walk.[8]

On October 10, 2022, acting at the Council's direction, Mastriana sent Mr. Jiang a letter notifying him that the installation violated the Code of Regulations of Haslet Park Condominium Association ("Association" or "Haslet Park"), which requires owners to obtain prior written approval from the Council before making any

---

[3]  *Id.*

[4]  D.I. 258 at 4.  The Association is the common-interest community and legal entity composed of all unit owners.  The Association acts through its elected governing body, which the Governing Documents refer to as the "Council" and which the parties and witnesses at times refer to as the "Board."  For clarity, this Report uses "Council" and "Board" interchangeably to describe the Association's governing body, while "Association" refers to the collective membership and legal entity itself.

[5] D.I. 260 at 3;  Pl. Answers to Def. Haslet Park Homeowners Ass'n's Interrogs. at 10–11 (D.I. 260, Ex. E).

[6]  JX 23 at 12–13.

[7]  D.I. 245 at 3.

[8]  Tr. 399:14–20;  Tr. 439:16–440:5.

structural modifications or alterations affecting a unit.[9]  The letter also notified Mr. Jiang that the windows were not the same as the prior windows and differed from other units in the neighborhood.[10]

On October 13, 2022, Mr. Jiang contacted Jon Mastriana and confirmed receipt of the letter.[11]  He sought clarification on what was considered a "structural change" and noted he did not realize windows were considered a structural change.[12] He requested clarification and to hear from the Board.[13]  Mr. Jiang continued his efforts to discuss the windows and the violation notice with the Haslet Park Board ("Board").[14]  However, by October 15, 2022, the Association had shifted decisively to attorney-driven handling and referred the matter to the Association's legal counsel.[15]  The Association informed Mr. Jiang that its counsel would communicate

---

[9]  JX 8.

[10]  *Id.*

[11]  JX 9 at 2–3.

[12]  *Id.*

[13]  *Id.*

[14]  *See generally* JX 14 (Mr. Jiang emailed Mastriana and Benjamin Hale at least twice after October 18, 2022 to discuss the windows and violation notice).

[15]  JX 9 at 1 (email correspondence indicating the matter would be referred to the Association's attorney);  JX 10 at 1;  JX 61 at 8 (the minutes from October 18, 2022 Board meeting provide a summary of the issue with Mr. Jiang and note that the matter has been turned over to legal counsel.);  Tr. 402:10–403:15.

only with his attorney and required all future correspondence to occur on an attorney-to-attorney basis.[16]

On October 16, 2022, Benjamin Hale escalated the dispute to Mastriana's management, Jeanne Scheper, and others.[17] Two days later, on October 18, 2022, communications show that Benjamin Hale believed the window installation invaded the condominium's common elements because it occurred without required prior approval and viewed it as a clear violation of the property controlled by the Association.[18]

By November 16, 2022, the Association had begun preparing and filing a notice and statement of lien, later reflected in a December 1, 2022 invoice.[19] On November 22, 2022, Mr. Jiang requested to participate in the upcoming January 17, 2023 meeting to address the Board; however, Jon Mastriana informed him that the Association's attorney stated there was "no reason to listen" unless Mr. Jiang first complied.[20] An email from Jon Mastriana further confirmed that Plaintiff would not be allowed to speak before the Board until his window violations were corrected.[21]

---

[16] JX 14.

[17] JX 11.

[18] JX 12.

[19] JX 17; JX 18; JX 19.

[20] JX 15.

[21] JX 15; JX 76 at 7 ("The response to that request was in an email to Plaintiff dated November 22, 2022 from Jon Mastriana . . . that informed Plaintiff that he would be permitted to speak with members of Council about whatever matters he wished to discuss

Mr. Jiang did not attend the January 17 meeting, and in discovery Mastriana characterized the meeting as a "workshop" only after the fact.[22] That characterization conflicts with the contemporaneous minutes from the January 17 meeting, which show the Board discussed homeowner matters, new business, and updates on ongoing community issues such as parking and trash—topics inconsistent with a workshop and indicative of a regular Board meeting.[23]

On February 24, 2023, the Council instructed its attorney to notify Mr. Jiang that fines would begin accruing if he failed to cure the ongoing violation.[24] The notice to Mr. Jiang advised him that the Haslet Park Council found the installed windows non-conforming and that fines would commence on March 10, 2023, at $20 per day for thirty days, and increase to $30 per day thereafter.[25] A Notice of Continuing Violation was recorded with the New Castle County Recorder of Deeds.[26] As of October 13, 2025, the Association calculated total fines of $27,678.00 (and counting).[27]

---

with such members if he removed the illegally installed windows and installed conforming windows.").

[22] JX 65 at 4.

[23] JX 61 at 10; JX 65 at 4.

[24] JX 17 at 2.

[25] *Id*.

[26] JX 18.

[27] D.I. 258 at 9.

On March 24, 2023, the Board invited Plaintiff to attend a Zoom hearing on April 11, 2023 to discuss the violation.[28] The invitation indicated a Zoom invite would be sent out closer to the date, however Plaintiff testified that he never received a Zoom link.[29] On June 26, 2023, Haslet Park notified Plaintiff of an opportunity to address the Board at its June 27, 2023 meeting and provided him with a Zoom link for participation.[30] The Board allotted Plaintiff ten minutes to speak, but he was ultimately permitted approximately forty minutes to present his position during the meeting.[31] At the meeting, the Board listened to the Plaintiff, but did not speak to the Plaintiff about the windows.[32]

Mr. Jiang's experience with the windows prompted him to run for a position with the Board.[33] Mr. Jiang participated in the 2023 Board election and campaigned actively.[34] Mr. Jiang created his own proxy forms and obtained proxies from other

---

[28] JX 24;  D.I. 260, Ex. P.

[29] JX 24;  D.I. 260, Ex. P;  Tr. 259:2–9.

[30] JX 32;  D.I. 260, Ex. Q.

[31] Tr. 407:15–16.

[32] Tr. 197:15–198:1.

[33] Tr. 10:14–16;  Tr. 198:13–18.

[34] Tr. 198:20–199:1;  Tr. 89:8–11 ("Q.  You actually got to vote for Mr. Jiang at the August 2023 election?  A.  Yeah . . ."); Tr. 414:18–20 ("Q.  Did Mr. Jiang actually get votes at the August 8, 2023, election?  A.  Yes.").

unit owners.[35]  When the initial annual meeting on July 18, 2023 failed to reach quorum, the Council reconvened the meeting and established quorum at the August meeting.[36]  At the August 8, 2023 Board meeting, unit owners cast votes in person and by proxy under the procedures set forth in the Code.[37]  The Board's legal counsel collected the proxies and ballots, and took them back to her office to tally.[38]  Mr. Jiang did not receive enough votes to obtain a seat on the Board.[39]

In addition to holding the election on August 8, 2023, the Council also passed a Resolution ("Resolution") creating a new assessment process for attorneys' fees.[40] The Resolution allowed the Association to assess reasonable attorneys' fees, costs, and expenses incurred by Haslet Park if the Association's attorney has to

---

[35] *See, e.g.* JX 44 (email from Charles Armstrong requesting his proxy form to be for Kun Jiang);  Tr. 263:21–23 (Plaintiff testified that he copied the HOA's proxy form and created one for himself).

[36] Tr. 38:15–22;  Tr. 332:8–17;  JX 56 (the voting results from the August meeting which confirms a quorum).

[37] JX 56;  Tr. 332:8–17;  JX 71 at 2.

[38] Dionne Philmore, a renter who attended the August 8 meeting, testified that Sydnor refused to disclose proxy forms received or count ballots publicly, placed the ballots in a box, and took them to her office.  Tr. 67:5–68:1. Jeanne Scheper testified that attorney Caren Sydnor received the proxy forms by a box on the table at the meeting.  Tr. 458:1–7. Tr. 459:2–8 ("A. Did I count the proxy form?  Q. Yeah.  A. No, I did not count.  Q. Who counted?  A. The lawyers.").

[39] JX 47 (Mr. Jiang did not receive enough votes to obtain a seat on the Board. The Inspector of Election certified that only the five nominees receiving the highest number of votes were elected, and Mr. Jiang received 17.56848% of the votes—far fewer than the elected candidates).

[40] JX 73.

"correspond with [an] Owner concerning any violation of the Governing Documents, any delinquent condominium fees, or delinquent common or special assessment."[41] Although the Resolution would be applicable to any homeowner, Mr. Hale testified that that the purpose was to recoup attorneys' fees from Mr. Jiang.[42] The Resolution does not identify who can impose attorneys' fees or a process if a unit owner objects to the fees.[43] The Resolution further makes a unit owner "responsible for reasonable attorneys' fees, costs and expense incurred by the Association" in the event there is litigation to collect an outstanding delinquent condominium fee, or special assessment, or to enforce any provision of the Governing Documents.[44] The Resolution was voted on by the Council in advance of the August 8, 2023 Board meeting, at what was described as a "pre-meeting."[45] Despite being reflected on the meeting minutes, it was not discussed during the August 8, 2023 Council meeting when the homeowners were present, rather it was

---

[41] *Id.*; Governing Documents are the Declaration, Code of Regulations, Bylaws, rules, and duly adopted Resolutions that collectively establish the rights, obligations, and procedures governing the Association and its members.

[42] Tr. 478:3–10.

[43] JX 73.

[44] *Id.*

[45] Tr. 478:11–15; Tr. 495:4–19; Tr. 500:3–501:9.

voted on by the Council shortly before the Board meeting and subsequently sent to Jon Mastriana to distribute to the homeowners.[46]

Mr. Jiang initiated litigation against Haslet Park and Mastriana on August 1, 2023.[47] Mr. Jiang's Complaint asserts that Mastriana and the Association conspired to apply the Code unfairly regarding the window violation, restricted his access to Board meetings, and interfered with the election process, among other things.[48] The Court addressed several claims and motions before and during trial. Before trial, the Court dismissed Mr. Jiang's defamation and intentional infliction of emotional distress claims.[49] During trial, the Court dismissed Mr. Jiang's civil conspiracy claim against all defendants, his claim for punitive damages, and his request for dissolution of the Board, the latter of which he raised only in pretrial briefs.[50] The Court also dismissed the breach of contract claim against Mastriana, finding no contractual relationship existed between Mr. Jiang and Mastriana.[51] Mr. Jiang's remaining claims of aiding and abetting, breach of fiduciary duties, and breach of

---

[46] Tr. 479: 2–10; Tr. 499:1–22; Tr. 500:3–501:9.

[47] D.I. 1.

[48] D.I. 23 at 24–33.

[49] D.I. 46 at 7–8, 9.

[50] Tr. 336:21–343:20.

[51] *Id.*

contract are addressed in this Final Report, in addition to the counterclaims for injunctive and declaratory relief, trespass, and attorneys' fees.

## II. ANALYSIS

### A. PLAINTIFF'S CLAIMS

#### 1. Aiding and Abetting Claim Against Mastriana

The basic four-part test for proving an aiding and abetting claim is well-settled under Delaware law and was articulated by this Court in *Malpiede*. The test requires "(1) the existence of a fiduciary relationship, (2) a breach of the fiduciary's duty, ... (3) knowing participation in that breach by the defendants, and (4) damages proximately caused by the breach."[52] In these instances "[t]o establish the element of scienter for aiding-and-abetting claims, 'the plaintiff must demonstrate that the aider and abettor had actual or constructive knowledge that their conduct was legally improper.'"[53]

Here, the Plaintiff alleges that Mastriana aided and abetted the Board's alleged breach by carrying out certain actions related to violation notices, homeowner complaints, and, most notably, the handling of the annual election and proxy

---

[52] *In re Mindbody, Inc., S'holder Litig.*, 332 A.3d 349, 389 (Del. 2024) (citing *Malpiede v. Townson*, 780 A.2d 1075, 1096 (Del. 2001)).

[53] *In re Columbia Pipeline Gp., Inc. Merger Litig.*, 342 A.3d 324, 356 (Del. 2025) (quoting *RBC Cap. Mkts., LLC v. Jervis*, 129 A.3d 816, 862 (Del. 2015).

10

process.[54] The Plaintiff claims that Mastriana acted as more than a neutral agent and instead actively facilitated improper conduct by the Board.[55]

The record does not support that conclusion. The testimony and exhibits show that Mastriana carried out tasks at the direction of the Board or the Association's legal counsel.[56] The testimony confirms that Mastriana added the Plaintiff's name to the ballot only after receiving a direct instruction from the Board.[57] Mastriana did not control the proxy form list, and there is no evidence that it removed, excluded, or otherwise interfered with the Plaintiff's participation in the election process.

Mastriana's role in the communications regarding the Plaintiff's right to address the Board underscores its limited, "agent-based" capacity. An email from Mastriana relayed, on behalf of the Board's attorney, that Plaintiff would not be allowed to speak before the Board until his window violations were corrected.[58] Similarly, Mastriana's explanation that a January 2023 gathering was a "workshop"

---

[54] D.I. 23 at 31–32; D.I. 257 at 13.

[55] D.I. 23 at 27, 31–32.

[56] Tr. 357:1–20; JX 38 at 3; JX 65 at 8; JX 6; Tr. 378:14–379:19.

[57] Tr. 357:8–13.

[58] JX 15; JX 76 at 7 ("The response to that request was in an email to Plaintiff dated November 22, 2022 from Jon Mastriana … that informed Plaintiff that he would be permitted to speak with members of Council about whatever matters he wished to discuss with such members if he removed the illegally installed windows and installed conforming windows.").

11

rather than a formal meeting was consistent with simply communicating the Board's position.[59]

The same pattern is evident in the handling of proxies and election materials. Mastriana's discovery responses repeatedly state that it did not handle or receive proxies, did not collect ballots, and did not tabulate election results.[60] The Board managed those functions directly.[61] Mastriana's involvement was limited to distributing explanatory notices, answering homeowner questions about the process, and forwarding communications as instructed.[62] Emails and correspondence in the record confirm that while Mastriana was listed as the contact person for inquiries, it clarified it was not responsible for creating proxy forms, distributing ballots, or sharing election results without authorization from the Board.[63]

Although some of Mastriana's communications have been poorly phrased and some of Mastriana's actions were poorly handled, there is no evidence of bad faith, deception, or intentional interference with the Plaintiff's rights. Nothing in the record suggests that Mastriana made or influenced the underlying decisions regarding attendance, policy, or the structure of Board meetings. Rather, it served

---

[59] JX 65 at 4.

[60] *Id.* at 8–9.

[61] *Id.*

[62] JX 38 at 3; JX 65 at 8–9.

[63] JX 6; JX 38 at 3; JX 65 at 8–9; Tr. 378:14–379:19.

as a conduit through which the Board's decisions and counsel's advice were communicated to homeowners. [64] The actions described fall within the ordinary scope of a property management company's duties.

Thus, the record does not establish that Mastriana knowingly participated in aiding and abetting. Plaintiff's aiding and abetting claim against Mastriana fails.

### 2. Breach of Fiduciary Duty Claims

To start, "[t]he equitable tort for breach of fiduciary duty has only two formal elements: (i) the existence of a fiduciary duty and (ii) a breach of that duty."[65] Under Delaware law, "[a]lthough a claim for breach of fiduciary duty has only two formal elements, a [plaintiff] cannot obtain a meaningful remedy without additional showings that parallel the other elements of a traditional common-law tort. One is harm to the [plaintiff] or a benefit wrongly received by the fiduciary. Another is a sufficiently convincing causal linkage between the breach and the remedy sought."[66] "To obtain a meaningful remedy for a breach of duty, a plaintiff must establish by a preponderance of the evidence either that the plaintiff suffered harm or that the

---

[64] JX 39 at 1 ("… I am demanding your firm to ensure a fair and transparent procedure for this election."); JX 47 ("Based upon the number of proxies and ballots inspected by me, I confirm a quorum.").

[65] *Basho Techs. Holdco B, LLC v. Georgetown Basho Invs., LLC*, 2018 WL 3326693, at *23 (Del. Ch. July 6, 2018).

[66] *Leo Invs. Hong Kong Ltd. v. Tomales Bay Cap. Anduril III, L.P.*, 342 A.3d 1166, 1192–93 (Del. Ch. 2025).

fiduciary wrongfully received a benefit. A plaintiff also must prove by a preponderance of the evidence that a sufficient causal linkage exists between the breach of duty and the remedy sought to make the remedy an apt means of addressing the breach."[67]

### i. Breach of Fiduciary Duty Claim Against Mastriana

The evidence does not support a finding that Mastriana breached its fiduciary duties owed to its members. Under the Management Agreement, Mastriana's authority was limited to administrative and ministerial functions, including the management of common areas, handling correspondence, maintaining records, and enforcing board-adopted rules, all performed under the explicit direction and instruction of the Board.[68] As previously noted, the record reflects that Mastriana operated within this confined scope of authority and did not exercise independent discretion that would give rise to liability for breach of fiduciary duty.[69]

---

[67] *Metro Storage Int'l LLC v. Harron*, 275 A.3d 810, 859 (Del. Ch. 2022), *judgment entered sub nom.*, *In re Metro Storage Int'l LLC v. Harron*, 2022 WL 2473354 (Del. Ch. July 5, 2022).

[68] JX 62 at 1 ("The Agent shall manage the common areas of the site, on behalf of the Board and under their direction. Both the Agent and the Board agree to the following terms and conditions listed in the total of fifty (50) numbered agreement items."); *see, e.g.* JX 62 at 4 ("The final decision for any contracts or services will be that of the Board"); *see also* JX 62 at 8 (direct reporting and instruction are further reinforced in provisions such as, "The Agent reports to and takes instruction from the President of the Council.").

[69] JX 62 at 1; *see e.g.* JX 62 at 4 ("The final decision for any contracts or services will be that of the Board"); *see also* JX 62 at 8 (direct reporting and instruction are further reinforced in provisions such as, "The Agent reports to and takes instruction from the President of the Council.").

Plaintiff contends that violation notices concerning his window replacement were issued summarily and without meaningful engagement, investigation, or provision of applicable guidelines, despite his attempts to seek clarification from Mastriana.[70] I disagree. This conduct does not demonstrate that Mastriana acted negligently or outside its delegated role. Rather, the evidence shows that such notices were issued under Board instruction, and that Mastriana merely executed administrative tasks consistent with its contractual responsibilities. The documents and testimony establish that Mastriana's actions were directed by the Board and that it lacked the discretionary authority necessary to support a finding of breach. Accordingly, the Court concludes that Mastriana did not violate any duty of care.

The record also does not establish a breach of the duty of loyalty. There is no evidence that Mastriana acted in bad faith, sought personal gain, or advanced its own interests at the expense of the Association or any of its members.[71] The record shows that Mastriana did not independently refuse requests or arbitrarily restrict access to information or participation.[72] When Plaintiff was ultimately granted a meeting with

---

[70] *See, e.g.* Tr. 367:4–6 ("Once the contract is signed, [Mastriana] then take[s] instructions from board members on what duties they want [Mastriana] to perform."); *see also* Tr. 353:21–24 ("Q. Does anybody other than Haslet Park Council have the ability to approve a request for architectural change? A. No."); *see also* Tr. 16:12–17:3 (Mastriana was at the July meeting wearing a bulletproof vest and appeared to only be there to assist with the election and not to vote or effect policy).

[71] Tr. 349:17–350:14 (referencing JX 62).

[72] Jon Mastriana stated unequivocally, "Once the contract is signed, we then take instructions from the board members on what duties they want us to perform." He

the Board, he was given a chance to present his position. Mastriana's limited refusal to communicate directly with Mr. Jiang during the dispute period appears to have been made at the instruction of the Council, reflecting adherence to procedural direction rather than the exercise of self-interested judgment.[73]

The record further shows there is no indication that Mastriana concealed information, manipulated disclosures, or otherwise deviated from Board directives.[74] Testimony and exhibits confirm that Mastriana did not prepare or distribute proxy forms, did not control ballot content, and merely forwarded communications as instructed by the Board.[75] While the Plaintiff alleges that Mastriana exercised discretion, facilitated certain improper Board actions, or stood to benefit from

---

described Mastriana's actions as strictly limited to collecting dues, maintaining financial records, communicating per Board request, and carrying out other board-assigned tasks. Tr. 367:4–6.

[73] Tr. 254:15–20; JX 46 at 1; JX 48 at 1.

[74] Mastriana testified that to get on the ballot, candidates would need to express interest to The Board. Tr. 356:18–24. Plaintiff created his own proxy, as Mastriana does not create or provide proxy forms for candidates for the Board elections. Tr. 357:16–359:6; Tr. 384:18–21. Mastriana does not decide whether an HOA Board Council meeting has met the quorum requirements. Tr. 359:13–360:6. Mastriana did not obstruct candidates from creating proxies or soliciting votes by proxies and is not aware of any other party obstructing this process. Tr. 385:4–10.

[75] Plaintiff admitted he "received a violation notice in the mail . . . from Mastriana Property Management, Inc." and that "John and Jon Mastriana . . . later emailed Plaintiff and confirmed the notification." Tr. 252:13–253:4. Those admissions show only that Mastriana communicated Board decisions and not that it created policy or exercised discretion. Jon Mastriana testified that no one other than Haslet Park Council had the ability to approve a request for architectural changes. Tr. 353:21–24; Tr. 384:9–21.

16

indemnification or payment provisions, these assertions are not substantiated by credible evidence.

The totality of the record establishes that Mastriana acted in accordance with its administrative responsibilities and did not engage in conduct amounting to disloyalty, bad faith, or self-dealing. Therefore, based on the evidence presented, the Court finds that Mastriana did not breach its fiduciary duties of care or loyalty.

ii.        Breach of Fiduciary Duty Claim Against Haslet Park

The record supports a finding that Haslet Park breached its fiduciary duties of care and loyalty to its members. The evidence demonstrates that the Association engaged in conduct that undermined transparency, fairness, and the equitable treatment of homeowners, particularly in connection with the 2023 Board election.[76]

During the 2023 election cycle, it appeared that proxy forms were primarily shared with residents who supported the sitting Board members, rather than to all

---

[76] Prior to the July 18, 2023 annual meeting, the Board, on behalf of the HOA, distributed proxy forms listing five candidates. Plaintiff's name was omitted from the list. JX 60 at 1. The Board President, Benjamin Hale, admitted to personally delivering his own proxy forms to residents. JX 74 at Def. Haslet Park Homeowner's Association Resp. to Pl.'s Req. for Admis. No. 43. Hale testified that the Board was under no obligation to provide proxy forms. Tr. 409:12–17. The Board Secretary, Jeanne Scheper, testified that the proxy forms were received by Caren Sydnor through a box at the time of the meeting, and did not go to Scheper. Tr. 458:1–7. The bylaws require proxies be "filed with the Secretary before the appointed time of each meeting." JX 71 at Art. II, § 5. The bylaws also suggest that the inspector of the election should be elected, not appointed, like Robert Valihura. JX 71 at Art. III, § 7(f).

unit owners on equal terms.[77]  The proxy form the Board circulated also did not include Mr. Jiang's name, and it does not appear that a single, consistent proxy form was made available to all residents on equal terms.[78]  This contributed to the impression that the proxy process was uneven and not clearly communicated.[79]  Although the Board contends that any homeowner could create and circulate their own proxy, the practical effect of this unequal process significantly compromised the integrity of the election.[80]  These facts implicate the principles Delaware courts apply when examining proxies.[81]  These actions reflect a failure to exercise sound

---

[77]  JX 37.

[78]  JX 37;  JX38.

[79]  JX 37;  JX38.

[80]  Prior to the July 18, 2023, annual meeting, the Board, on behalf of the HOA, distributed proxy forms listing five candidates.  Plaintiff's name was omitted from the list.  JX 60 at 1.  The Board President, Benjamin Hale, admitted to personally delivering his own proxy forms to residents.  JX 74 at Def. Haslet Park Homeowner's Association Resp. to Pl.'s Req. for Admis. No. 43.  Hale testified that the Board was under no obligation to provide proxy forms.  Tr. 409:12–17.  Dionne Philmore, a renter who attended the August 8 meeting, testified that Sydnor refused to disclose proxy forms received or count ballots publicly, placed the ballots in a box, and took them to her office.  Tr. 67:5–68:1.  Plaintiff testified that Sydnor did not accept his July 2023 meeting proxy forms and told him to get new forms for the August meeting.  Tr. 211:2–21.  However, the proxy forms from the July and August meetings were combined to meet the quorum.  JX 56 at 6–7; JX 60.

[81]  Delaware law construes proxies narrowly and requires precise drafting to ensure the scope of the authority granted is clear and unambiguous.  *See Daniel v. Hawkins*, 289 A.3d 631 (Del. 2023) (reaffirming strict construction of proxies under Delaware law).  In *In re CII Parent, Inc.*, the Court held that a one-page proxy limited to "annual and special meetings" did not authorize action by written consent, absent broader language in related agreements.  2023 WL 2926571 (Bankr. D. Del. Apr. 12, 2023).  This principle echoes *Freeman v. Fabiniak*, where proxies restricted to shareholder meetings were deemed insufficient to permit consent procedures.  1985 WL 11583 (Del. Ch. Aug. 15, 1985). Practitioners should therefore draft proxies to expressly encompass both meeting and

18

judgment and impartial administration consistent with the duty of care, instead suggesting a self-perpetuating governance approach that disadvantaged dissenting members.

The record further shows that the Board's decision-making in responding to Mr. Jiang's architectural dispute reflected an adversarial posture. When Mr. Jiang asked to address the Board shortly after receiving the violation and not escalate to legal counsel, more than five months passed before the Board permitted his request and more than eight months elapsed since the initial violation before Mr. Jiang was eventually permitted to address the Board.[82] The record supports the conclusion that Mr. Jiang sought to participate, the Board excluded him based on alleged

---

consent actions and include durational language sufficient to override the three-year default term under DGCL § 212(b). 8 *Del. C.* § 212(b). While these cases arise in corporate and quasi-corporate contexts, the same principles apply here: any entity relying on proxy voting must ensure fairness, clarity, and equal access to the franchise. This principle finds further support at the federal level, which offers additional guidance on the importance of fairness and clarity in proxy voting. The SEC's universal proxy rules require proxy cards in contested corporate elections to list all nominees—from both registrants and dissidents—so voters retain the same choices available to them when voting in person. *See* SEC, UNIVERSAL PROXY: A SMALL ENTITY COMPLIANCE GUIDE (2022). Although this Association is not a corporate issuer and the federal regime does not directly apply, the Delaware and federal approaches illustrate a broader commitment to transparency and undistorted voter choice.

[82] On March 24, 2023, Plaintiff received an email from the Board's counsel inviting him to attend a Zoom hearing on the ongoing violation but Plaintiff neither responded nor attended. JX 24; D.I. 260, Ex. P. Mr. Jiang was permitted to address the Board at the June 27, 2023, meeting. JX 32; D.I. 260, Ex. Q at 1.

noncompliance, and the Board later attempted to justify that exclusion by labeling the meeting as a "workshop," a rationale not borne out by the meeting's substance.

The Board also declined Mr. Jiang's repeated requests for an in-person inspection that might have resolved factual disagreements regarding the window modification, or at a minimum could have helped explain to Mr. Jiang the problem with the windows.[83] When Mr. Jiang expressed confusion and sought clarification about the meaning of a term, the matter was referred to legal counsel.[84] The Board escalated the matter through violation notices, fines, and the assessment of legal fees, adopting a punitive approach rather than one rooted in fair enforcement. The imposition of legal expenses to Mr. Jiang, while borne in part by the community, further suggests an imprudent use of Association resources and a disregard for proportionality in enforcement.[85]

---

[83] Plaintiff claims through his November 22, 2022, email that he made multiple requests to the Board to be heard at a Board meeting. JX 14. Plaintiff testified that because he was told that Robert Valihura would not correspond with him anymore and only speak to his attorney, he was "hitting a wall" but still wanted to request access to the Board meeting. Tr. 123:1–9 (referring to JX 14). Jon Mastriana responded to Plaintiff's November 22, 2022, email stating that Plaintiff would be permitted to access the Board meeting if he replaced his windows with conforming windows. JX 15. Counsel for Defendant Haslet Park was unwilling to mediate or engage in other alternative dispute resolution mechanisms unless and until the windows were replaced. JX 26 at 3.

[84] D.I. 5, Ex. H at 5.

[85] JX 73 at 1 ("In the event litigation is necessary to collect any outstanding delinquent condominium fees or special assessments, or to enforce any provision of the Governing Documents, the Owner shall be responsible for reasonable attorneys' fees, costs and expenses incurred by the Association in such action.").

20

The Board also conditioned Mr. Jiang's participation in meetings and internal processes on his compliance with disputed directives.[86] In multiple communications, the Board showed that it would not hear from him or permit attendance at Association meetings until he complied, effectively foreclosing his opportunity to be heard while the central question of compliance remained unresolved.[87] This exclusionary practice undermined the principles of openness and procedural fairness that the duty of care requires.

Although Delaware law and the Association's own documents contemplate the adoption of an internal dispute resolution policy, the Board admitted that no such procedure had been implemented and that it declined to participate in mediation.[88] The failure to engage in good-faith resolution efforts, when coupled with the denial of meeting access and selective enforcement of participation rights, reflects a disregard for member interests which are inconsistent with the obligations of diligence and impartiality inherent in the duty of care.

The Board also breached its duty of loyalty. The trial exhibits show that the Board engaged in self-interested conduct by selectively distributing proxies, controlling electoral and financial information, and privately counting ballots to

---

[86] JX 23 at 6; JX 15; JX 26 at 3.

[87] JX 23 at 6; JX 15; JX 26 at 3.

[88] Tr. 297:3–6.

21

maintain its control over the Association's governance rather than promote open and independent participation.[89]  In addition,  the Board used the HOA's legal resources against a dissenting homeowner and then charged substantial portions of those expenses to that homeowner's account.[90]  Through this conduct, the Board placed its own interest over the fair treatment of the Association's members and its fiduciary obligations to the membership.

These actions show significant procedural irregularities and a pattern of decision-making inconsistent with prudence and loyalty.  The Court therefore finds that Haslet Park breached both its duty of care and its duty of loyalty.

### 3.    Breach of Contract by Haslet Park

The evidence does not support a finding that Haslet Park breached its contractual obligations in connection with the installation of Plaintiff's replacement windows.  Under Delaware law, elements of a claim for breach of contract are "(i) a

---

[89] JX 39 (refusal to participate in accessible, good faith dispute resolution violates the basic prudential norms and undermines both impartiality and member rights to internal remedies);  JX 51 (failure to send out monthly Board meeting minutes as the HOA did in the past and to disclose to the members the ongoing lawsuit against the HOA despite the financial report showing $17,614.21 more legal expenses).

[90] JX 51 (Plaintiff citing over $17,000 in legal expenses incurred by the HOA); JX 73 (the Board Resolution requiring the individual owners to pay the HOA's legal fees concerning the owner's violations of the HOA's Governing Documents);  Tr. 199:6–11 (Mr. Jiang testified he received a monthly bill to collect fines.  The bill started off around $1,000 and at the time of trial was over $25,000);  Tr. 478:3–16 (Benjamin Hale confirming that the purpose of the JX 73 Resolution was to recoup attorneys' fees from Mr. Jiang, and that the Resolution was passed one week after this litigation commenced).

contractual obligation, (ii) a breach of that obligation by the defendant, and (iii) a causally related injury that warrants a remedy, such as damages or in an appropriate case, specific performance."[91] The plaintiff need only plead causally related harm, which the plaintiff can accomplish by pleading a violation of the plaintiff's contractual rights.[92]

The Governing Documents, create a contractual framework requiring unit owners to obtain prior written approval before making any structural modifications, alterations, or installations within their units.[93] Section 3 of the Code explicitly mandates that a unit owner notify the Council in writing through the management agent or the President before undertaking such work.[94]

Evidence presented at trial establishes that this approval process was communicated to owners and consistently enforced.[95] Management informed

---

[91] *Garfield on behalf of ODP Corp. v. Allen*, 277 A.3d 296, 328 (Del. Ch. 2022) (quoting *AB Stable VIII LLC v. Maps Hotels & Resorts One LLC*, 2020 WL 7024929, at *47 (Del. Ch. Nov. 30, 2020), *aff'd*, 268 A.3d 198 (Del. 2021)).

[92] *Id.* at 328.

[93] JX 70; JX 71 at Art. VI, § 3.

[94] JX 71 at Art. VI, § 3 ("A unit owner shall not make structural modifications or alterations of his unit or installations, in his unit or installations located therein, without previously notifying the Council in writing, through the management agent, if any, or through the President if no management agent is employed."); JX 71 at Art. IV, § 3(a) ("The Council shall be responsible for . . . replacement of the common elements including, but not limited to, fences, driveways, walks, parking, exteriors . . . , and any common utility system.").

[95] The Code of Regulations of Haslet Park specifies that "[a] unit owner shall not make structural modifications or alterations of his unit or installations, in his unit or installations located therein, without previously notifying the Council in writing, through the

23

owners, including Mr. Jiang, that any exterior or structural work such as window replacement required advance written approval.[96] Other residents followed this process by submitting written requests for review, and the Council evaluated each proposal individually to ensure compliance with community standards.[97]

Mr. Jiang did not comply with this process.[98] He did not submit a written request to the Council or management before replacing his windows.[99] His testimony shows that he relied on a conversation with the former Board president, which he believed sufficient.[100] Plaintiff further testified that he did not attempt to cure the violation after receiving the initial violation notice in October 2022 or the

---

management agent, if any, or through the President if no management agent is employed." JX 71 at Art. VI, § 3. Testimony was clear and concise from both Mr. Hale and Ms. Scheper, both of whom served on Council for decades, that any alteration required approval. Tr. 393:1–5; Tr. 395:5–19; Tr. 433:17–436:13. Plaintiff was advised of this process. Tr. 352:12–353:20; JX 1.

[96] JX 1; Tr. 352:20–353:24.

[97] Plaintiff did not receive different treatment than any other unit owner as it pertained to dealing with the windows in his unit. Tr. 365:13–17; Tr. 416:7–417:17. Ben Hale testified that his wife painted their front door once without appropriate Council approval and as a result, they had to repaint their door. Tr. 414:2–17. Jeanne Scheper testified that she followed the procedure required by the Code before replacing her own windows. She sought to replace six windows and one of the windows was denied because it was a casement window. She could not install that window. Tr. 434:1–436:13.

[98] Tr. 97:8–13 (Plaintiff testified that he decided to "update the windows" but never mentions explicitly asking for Board approval for the windows); Tr. 353:19–24.

[99] Tr. 246:8–15.

[100] Tr. 242:3–246:15.

follow-up notice of violation in February 2023.[101] However, the Governing Documents require formal approval from the Council as a body, not a single member or officer.[102] Trial exhibits confirm that no written application was received before or during installation.[103] Mr. Jiang's communications disputing the violation and requesting a hearing occurred only after the installation had been completed, well beyond the point at which approval should have been sought.[104]

The record further demonstrates that Haslet Park applied the same approval requirement to all residents. When other unit owners sought to make exterior modifications, they submitted written requests and awaited a formal decision before

---

[101] Tr. 253:10–15; JX 8; JX 17 (the February 2023 violation notice); Joint Pretrial Order at 9 (showing that one of the matters to be decided at trial is whether Defendant Haslet Park can obtain a permanent injunction ordering Plaintiff to replace the non-conforming windows with conforming ones, meaning that before September 9, 2025 Plaintiff had still not replaced the windows).

[102] JX 8; JX 71 at Art. VI, § 3.

[103] JX 8.

[104] Plaintiff admitted during his testimony that he had never attended any meetings prior to the election meetings. Tr. 253:16–257:7. This admission was consistent with his Answer to Interrogatory No. 18. D.I. 260, Ex. E at 16–17. Although Plaintiff testified that he was not given an opportunity to be heard regarding the violation, the record reflects that on March 24, 2023, Plaintiff received an email from the Board's counsel inviting him to attend a Zoom hearing on the ongoing violation but Plaintiff neither responded nor attended. JX 24; D.I. 260, Ex. P. Mr. Jiang was permitted to address the Board at the June 27, 2023 meeting. JX 32; D.I. 260, Ex. Q at 1. Although the Board initially allotted Plaintiff ten minutes to speak, Hale testified that Plaintiff was ultimately permitted approximately forty minutes to present his position during the meeting. Tr. 407:15–16. Hale testified that despite the June 27 meeting, to date, Plaintiff has not cured the violation. Tr. 407:17–19.

proceeding.[105] In cases of unauthorized work, the Association required cessation of construction and compliance with the Governing Documents before granting approval.[106] This consistent enforcement shows that Haslet Park acted within its contractual authority and in accordance with its Governing Documents.

Accordingly, judgment is entered in favor of Haslet Park regarding the breach of contract claim.

## B. DEFENDANT'S COUNTERCLAIMS

Haslet Park filed counterclaims seeking (1) declaratory judgment that Mr. Jiang is in continuing violation of the HOA bylaws by failing to replace his windows, (2) that Mr. Jiang trespassed on the common elements by installing non-conforming windows, (3) that Haslet Park is entitled to injunctive relief, and (4) attorneys' fees and costs.[107]

### 1. Count I of the Counterclaim: Declaratory Judgment

Haslet Park seeks a declaratory judgment that Mr. Jiang is in continuing violation of the Governing Documents and the Delaware Unit Property Act by installing, and then refusing to replace, the non-conforming windows.[108] The

---

[105] Tr. 365:18–22; Tr. 416:16–417:3; Tr. 434:10–436:2.

[106] Tr. 414:2–17.

[107] D.I. 72 at 15–23.

[108] *Id.* at 15–17.

Declaratory Judgment Act authorizes this Court to declare the parties' "rights, status and other legal relations whether or not further relief is or could be claimed."[109]

The evidence supports Haslet Park's request for a declaration of violation. The Governing Documents require unit owners to obtain approval before undertaking exterior or structural changes of the type at issue here, and they empower the Council to enforce those restrictions to protect the community's uniformity and the common interest.[110] As noted in the prior section, the record shows Mr. Jiang did not receive prior approval to install the replacement windows that the Council later determined did not conform to Haslet Park's standards.[111] The record also shows the Council directed Mr. Jiang to remove or replace the windows, and he has not done so. Mr. Jiang therefore remains in violation, and that violation continues.[112]

Accordingly, the Court enters declaratory judgment in favor of Haslet Park and against Mr. Jiang declaring that Mr. Jiang is in violation and continuing violation

---

[109] 10 *Del. C.* § 6501.

[110] JX 8;  JX 71 at Art. VI, § 3.

[111] JX 8;  Tr. 242:3–246:15.

[112] Tr. 253:10–15;  JX 8;  JX 17 (the February 2023 violation notice);  Joint Pretrial Order at 9 (showing that one of the matters to be decided at trial is whether Defendant Haslet Park can obtain a permanent injunction ordering Plaintiff to replace the non-conforming windows with conforming ones, meaning that before September 9, 2025 Plaintiff had still not replaced the windows).

of the Governing Documents based on the installation and continued presence of the non-conforming windows.

As part of its request for a declaratory judgment, Haslet Park seeks an award of the fines assessed to Mr. Jiang for his installation of the windows.[113] The Court finds that the monetary fine imposed on the Plaintiff cannot stand. Specifically, § 81-302 of the Delaware Uniform Common Interest Ownership Act ("DUCIOA") gives the Association broad power, including the ability to "exercise any other powers necessary and proper for the governance and operation of the association."[114] However, it also must "exercise the degree of care and loyalty to the association required of an officer or director of a corporation organized under Delaware law[,]" which requires fair and impartial administration of association rules.[115]

The record establishes that the Association's action of assessing Mr. Jiang's fines was not a neutral exercise of its enforcement authority but a retaliatory and arbitrary response to the Plaintiff's protected conduct. The timing, context, and absence of an established fine policy all point to a motive inconsistent with the fair and even-handed administration required under Delaware law.

---

[113] D.I 72 at 15–17.

[114] 25 *Del. C.* § 81-302.

[115] 25 *Del. C.* § 81-303; *see also,* 25 *Del. C.* §§ 81–302(b), (f) (prohibiting arbitrary and capricious Board action).

This is not a conclusion that Haslet Park does not have the ability to assess fines against a homeowner, however, the arbitrary and retaliatory use of fines undermines the fundamental fairness and good faith required in the governance of common-interest communities. Associations derive their enforcement power from the collective agreement of their members, and they must therefore exercise that power with restraint and transparency. When enforcement becomes a means of reprisal, rather than a neutral mechanism to maintain order, the association acts outside the bounds of its authority.

The Governing Documents for Haslet Park contained no fine schedule, no defined procedure for imposing monetary penalties, and no provision specifying the amount or duration of daily assessments for violations such as unauthorized window replacement. The absence of such structure left enforcement decisions vulnerable to arbitrary application.

Although the Plaintiff failed to obtain prior written approval for his window replacement, that breach alone does not validate the Association's conduct of assessing more than $27,000 in fines for a non-conforming window while simultaneously refusing to allow the homeowner an opportunity to address the Board and gain an understanding of the violation and fine. Although the Association retains the right to enforce its rules, it must do so in good faith and through

established procedures.  Accordingly, the Court concludes that the monetary fine issued against the Plaintiff is unenforceable.

### 2. Count II of the Counterclaim: Trespass

Haslet Park argues that Mr. Jiang's installation of the windows without permission constitutes a trespass on the common elements in violation of the Governing Documents.[116]  Haslet Park asserts that unit owners only own the interior box of the building, and the structural elements outside the interior box, are common elements under control of the Association.[117]  Thus, the contention that the installation of the window and frame as affixed to a common element constitutes a trespass on those elements because Mr. Jiang did not obtain HOA approval.

"The tort of trespass consists of entry onto real property without the permission of the owner."[118]  The counterclaim plaintiff cannot recover on the claim of trespass. Where all unit owners—including Mr. Jiang—collectively own the common elements, it is conceptually difficult to characterize his conduct as a "trespass" against property in which he holds a present ownership interest.  Even accepting the Association's rhetoric that the window remained "affixed to the

---

[116] D.I 72 at 15–17;  JX 70 § 5(a)(ii) (defining "common elements").

[117] *Id.* at 12.

[118] *Del-Chapel Assocs. v. Conectiv*, 2008 WL 1934503, at *3 (Del. Ch. May 5, 2008) (citing *Fairthorne Maint. Corp. v. Ramunno,* 2007 WL 2214318, at *5 (Del. Ch. July 20, 2007)).

common elements," without their permission, Section 5(b) frames the common elements as collectively owned by all unit owners as undivided tenants in common, meaning each owner is a shared-interest holder in those elements, including Mr. Jiang.[119]

Under these circumstances where the Plaintiff is a co-tenant of the area Defendant asserts he has trespassed, and that area has not been destroyed, I find no trespass has occurred. Although Plaintiff did violate the requirement to obtain prior approval, that conduct is distinct from trespass.

### 3. <u>Count III of the Counterclaim</u>: Permanent Injunctive Relief

The Court of Chancery applies a three-part test to determine whether to grant injunctive relief. To obtain that relief, the Petitioner, Haslet Park, must prove, by a preponderance of the evidence: "(1) actual success on the merits of the claims; (2) that the [Petitioner] will suffer irreparable harm if injunctive relief is not granted; and (3) that the harm to the [Petitioner] outweighs the harm to the [Respondent] if an injunction is granted."[120] Applying this test, the record establishes that Haslet Park has met each element and is entitled to injunctive relief.

---

[119] JX 70 § 5(b) (The [c]ommon [e]lements…shall be owned by the "Condominium Unit" owners …as undivided tenants in common…".).

[120] *Pleasant Hill Homeowners Ass'n, Inc. v. Quillen*, 2025 WL 26086, at *5 (Del. Ch. Jan. 3, 2025).

First, the Haslet Park Governing Documents require unit owners to obtain written approval from the Council before making exterior changes.[121] The Plaintiff proceeded with those alterations without formal approval.[122] Haslet Park's evidence, including violation notices and photographs, show that Mr. Jiang's window replacements occurred without prior authorization.[123] Furthermore, the record contains multiple instances demonstrating consistent application.[124] This satisfies the element of actual success on the merits.

Mr. Jiang's arguments that the Association waived its right to enforce the restriction or acted arbitrarily lack merit. The record contains no evidence of systemic non-enforcement or arbitrary administration. On the contrary, the Board

---

[121] JX 70 § 9(b); JX 71 at Art. VI, § 3; JX 72 § 4.

[122] JX 17 at 1; JX 71 at Art. VI, § 3.

[123] Comparing the photos of the previous windows and the new, non-conforming windows shows that the windows are entirely different. *Compare* JX 23 at 12 (photos of the new, non-conforming windows), *with* JX 23 at 13 (photos of the previous windows); *see also* JX 17 (the February 2023 violation notice); *see also* JX 8 (the October 2022 violation notice); *see also* JX 59 (photos of other units' windows).

[124] Plaintiff was not treated differently than other unit owners pertaining to his window installation. Tr. 365:13–17; Tr. 416:12–417:3. Ben Hale testified he had to repaint his door after his wife painted it without Board approval. Tr. 414:5–14. Jeanne Scheper testified that she asked the Board for approval before replacing her windows, and one of her six windows was denied because it was a casement window. She did not install that window. Tr. 434:7–436:13.

has demonstrated consistency in its application of the rules.[125]  Even if minor violations existed, they did not amount to an abandonment of enforcement rights.

Second, Haslet Park established irreparable harm.  Unauthorized exterior modifications strike at the heart of what the Association is charged to protect: the community's uniform architectural appearance, collective standards, and property values.  It is not merely the physical change to one property but the loss of uniformity and *trust* in the Association's authority that constitutes irreparable injury.  Allowing an owner to retain unapproved alterations would undermine the credibility of the Governing Documents and weaken the Association's ability to ensure compliance.[126]

Third, the balance of harms weighs heavily in favor of Haslet Park.  The harm to the Association and the broader community from continued noncompliance outweighs any inconvenience or cost to Mr. Jiang associated with restoring the property.  The Plaintiff's burden consists only of returning the property to a condition consistent with the rules that bind all homeowners.  In contrast, failure to enforce those rules would expose the Association to ongoing challenges to its authority and could encourage other owners to disregard the approval process.

---

[125] *Id.*

[126] JX 71 at Art. I, § 3 (explains the relationship between the HOA and the people living in the community, which Plaintiff breached).

Consistent enforcement ensures fairness among homeowners who comply with the restrictions and protects the collective investment that the Haslet Park community represents.

Because Haslet Park achieved actual success on the merits, demonstrated irreparable harm, and established that the balance of harms favors enforcement, injunctive relief is appropriate. Mr. Jiang must remove the unapproved windows and bring the property into full compliance with Haslet Park's Governing Documents.

### 4. <u>Counts IV–VIII of the Counterclaim</u>: Fines and Attorneys' fees

Under the American rule, each party ordinarily bears its own attorneys' fees, absent a statutory or contractual fee-shifting provision, or a recognized equitable exception such as bad faith litigation conduct.[127] Counterclaim plaintiff, Haslet Park, asserts five bases for imposing attorneys' fees and costs; contractual fee shifting under Article 9(g) of the Declaration, contractual fee shifting of the Governing Documents, statutory fee shifting under 25 Del. C. § 81-417(a), statutory fee shifting under 25 Del. C. § 2210, and statutory fee shifting under 25 Del. C. § 81-315(e).[128]

---

[127] *Mahani v. Edix Media Gp., Inc.*, 935 A.2d 242, 245 (Del. 2007); *see generally Dearing v. Mixmax, Inc.*, 2023 WL 2632476 (Del. Ch. Mar. 23, 2023) (ORDER).

[128] D.I. 258 at 14–15.

### i.       Fee shifting under Article 9(g)

Another "exception to the American rule 'is found in contract litigation that involves a fee shifting provision.' When a contract contains a fee shifting provision, Delaware courts will enforce that provision."[129] This Court must interpret fee shifting provisions as it would any contract provision, by interpreting them according "to their plain meaning."[130]

Defendant Haslet Park argues that under the Declaration, specifically under Article 9(g), the Association is allowed to bring an action to recover sums due and damages, including the expenses of addressing misconduct and failures to comply.[131] Admittedly, a review of Article 9(g), does permit the Council compensation, however, despite the finding in this Report that Haslet Park is entitled to declaratory and injunctive relief, I decline to shift attorneys' fees when it was also determined that Haslet Park breached their fiduciary duties.[132]

### ii.      Fee shifting under the Governing Documents

---

[129] *GB-SP Hldgs., LLC v. Walker*, 2024 WL 4799490, at \*24 (Del. Ch. Nov. 15, 2024) (quoting *Bako Pathology LP v. Bakotic*, 288 A.3d 252, 280 (Del. 2022)) (internal citation omitted).

[130] *Bako Pathology LP*, 288 A.3d at 281 (quoting *Scion Breckenridge Managing Member, LLC v. ASB Allegiance Real Est. Fund*, 68 A.3d 665, 683 (Del. 2013)).

[131] D.I. 72 at 19.

[132] JX 70 § 9(g)("Failure to comply with this Declaration, Code of Regulations, or nay provision of the Delaware Unit Property Act… shall subject the offending party to an action for recovery of damages or for the injunctive relief, or both…").

Haslet Park argues that the Governing Documents bind all unit owners in the community.[133] Defendant Haslet Park argues it is entitled to contractual fee shifting in light of the Resolution passed by the Council, which it argues is contractually binding on Mr. Jiang.[134]

The Association created the Resolution seven days after Mr. Jiang filed his lawsuit, in an effort to assess legal fees against the Plaintiff. Immediately after the Plaintiff initiated legal action against the Board, the Council convened before the election and annual Board meeting, outside the purview of the homeowners, and adopted a Resolution imposing a fine specifically against Mr. Jiang.[135] The record also confirms that this was shortly after the Plaintiff had expressed an interest in serving on the Board, making the Board's rapid response appear motivated by reprisal rather than neutral rule enforcement.[136] The Association has offered no persuasive justification for the timing or nature of this penalty and the testimony offered at trial further acknowledged that the resolution was created for Mr. Jiang and for this litigation.[137]

---

[133] D.I. 72 at 4–5.

[134] D.I 258 at 4–5 and 14–15; JX 73.

[135] JX 73; D.I. 1.

[136] JX 28; JX 37 at 2.

[137] Tr. 478:3–479:12; Tr. 481:7–483:9; Tr. 485:3–13.

Although the Association retains the right to establish rules, it must do so in good faith and through established procedures. The imposition of an *ad hoc* fine without supporting authority and in direct temporal proximity to the Plaintiff's legal challenge demonstrates bad faith and retaliation.[138] Accordingly, the Court concludes that the assessment of legal fees under the Resolution was retaliatory, not done in good faith, and is thus unenforceable.

### iii. Attorneys' fees under 25 Del. C. § 81-417(a)

Section 81-417(a) is a fee-shifting provision within DUCIOA framework. It provides for attorneys' fees in actions concerning violations or enforcement of rights under the Act, the Declaration, bylaws, or rules of the common interest community. As a statutory exception to the American rule, § 81-417(a) authorizes a court to award reasonable attorneys' fees to a prevailing party or party entitled to relief, subject to the statute's terms.

Haslet Park argues that Plaintiff's willful and intentional failure to comply with the Code, specifically Article VI, Section 3 that requires written notice of a structural change, should result in an award of reasonable attorneys' fees.[139] However, § 81-417(a) gives the Court discretion to assess reasonable attorneys' fees "in an appropriate case." Although Mr. Jiang did fail to obtain approval to change

---

[138] Tr. 199:6–11.

[139] JX 71.

his windows, his lack of approval was not due to a disregard of the rules, rather an obvious confusion of what was considered a structural change, and sincere belief that the change was not a structural change. As such, attorneys' fees will not be assessed to Mr. Jiang under this theory.

### iv. Attorneys' fees under 25 *Del. C.* § 2210

Haslet Park seeks to shift attorneys' fees under 25 *Del. C.* § 2210, which permits the Association to bring an action against a unit owner to recover damages, including the expenses related thereto for failing to comply.[140] Haslet Park argues that the Association incurred fees and expenses due to the Plaintiff's failure to comply.[141] However, as noted previously, the Association decided almost immediately to involve counsel in this matter when Mr. Jiang expressed confusion, sought clarification, and wanted to explain his position and hear from the Council.

Based on the Association's punitive and retaliatory approach in handling this matter, I decline to shift legal fees under this section. The record establishes that Mr. Jiang's claims arose from a genuine dispute over the Association's enforcement

---

[140] *See* 25 Del. C. § 2210 ("Failure to comply with the code of regulations and with such rules governing the details of the use and operation of the property and the use of the common elements …, conditions and restrictions set forth in the declaration or in deeds of units or in the declaration plan shall be grounds for an action for the recovery of damages or for injunctive relief or both maintainable by any member of the council on behalf of the council or the unit owners or in a proper case by an aggrieved unit owner or by any person who holds a mortgage lien upon a unit and is aggrieved by any such noncompliance,").

[141] D.I. 258 at 15.

of its architectural approval provisions, his unsuccessful attempt to gain a seat on the Board, and the Board's method of imposing fines. Mr. Jiang's actions were based on legitimate grievances, including the Board's decision to pass a retaliatory resolution shortly after he sought involvement in Board activities and initiated litigation. This factual context supports the reasonableness of Mr. Jiang's decision to seek judicial intervention.

### v. Attorneys' fees under 25 Del. C. § 81-315(e)

Section 81-315(e) addresses assessments and the collection of common expense liabilities within common interest communities. This section allows the recovery of attorneys' fees incurred in the collection or enforcement of unpaid assessments or related charges authorized by governing documents.[142] As a modification of the American rule, § 81-315(e) makes fees part of the recoverable amounts when an association pursues delinquent assessments, subject to statutory and contractual prerequisites.

As discussed earlier in this Report, Mr. Jiang has not breached his obligation to pay assessments from the Association because the fines and legal expenses against Mr. Jiang were not assessed appropriately. As such, attorneys' fees under 25 *Del. C.* § 81-315(e) are not warranted.

---

[142] *See* 81-315(e).

Finding that none of the exceptions to the American Rule are appropriate here, the Court declines to shift attorneys' fees. Each party must bear its own costs of litigation.

## III. CONCLUSION

For the reasons explained above, I recommend that judgment be entered in favor of Mastriana, partially in favor of Mr. Jiang, and partially in favor of the Association. The Association is entitled to declaratory and injunctive relief requiring Mr. Jiang to remove the unapproved windows and restore his unit in compliance with the Governing Documents. However, the monetary fines imposed against Mr. Jiang are unenforceable. The Court further finds no trespass and denies the Defendants' request for attorneys' fees. Each party shall bear its own costs.

The parties shall meet and confer to determine a reasonable time frame for Mr. Jiang to update the non-conforming window with time for Mr. Jiang to obtain the necessary approval by the Council. The parties shall submit a stipulation to the Court within thirty days, outlining a plan of action. If the parties are unable to agree, competing proposals may be submitted to the Court.

This is my Final Report, and exceptions may be filed under Court of Chancery Rule 144.